UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NATALIE AMOS, on behalf of herself and all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LINCOLN PROPERTY COMPANY, )<br>)<br>Defendant. ) | <br><br><br><br><br>Civil No. 3:17-cv-37<br>Judge Aleta A. Trauger |

## MEMORANDUM

The defendant has filed a Motion to Compel Arbitration and Stay Proceedings (Docket No. 19), to which the plaintiff has filed a Response in Opposition (Docket No. 22), and the defendant has filed a Reply (Docket No. 27). With leave of the court, the plaintiff has also filed a Sur-Reply in Opposition to the Motion (Docket No. 33), and the defendant has filed a Response to the Sur-Reply (Docket No. 37). For the reasons stated herein, the motion will be denied.

## PROCEDURAL & FACTUAL BACKGROUND

Lincoln Property Company ("Lincoln") is a Texas corporation that manages residential properties nationwide, including the Gale Lofts apartment complex in Nashville, Tennessee. (Docket No. 1 ¶¶ 5–6; Docket No. 20, p. 1.) The plaintiff, Natalie Amos, was employed as a leasing agent – and, later, business manager – at the Gale Lofts complex from January of 2015 to November of 2016.[1] (Docket No. 1 ¶ 8; Docket No. 21 (Decl. L. Fetzer) ¶ 4.) On January 10,

---

[1] In the pending motion, Lincoln contends that it is not the proper party to this case, because the plaintiff was employed by its affiliate, Lincoln Apartment Management Limited Partnership. (Docket No. 20, p. 1 n.1.) This affiliate – which appears to be represented by the

1

2017, Ms. Amos filed this action pursuant to § 216(b) of the Fair Labor Standards Act ("FLSA") on behalf of herself and "[a]ll Business Managers currently or formerly employed by [Lincoln] at any time since January 10, 2014, who did not direct the work of two or more full-time employees or the equivalent in at least one workweek." (Docket No. 1 ¶ 16.) Ms. Amos alleges that Lincoln violated the FLSA when it misclassified its business managers as exempt from the FLSA's overtime provisions to avoid paying them an overtime rate for hours worked over 40 in a workweek. (*Id.* ¶¶ 8–15.) Lincoln now seeks an order compelling arbitration of Ms. Amos's claims on the grounds that Ms. Amos agreed "to resolve any claim relating to her employment through final and binding arbitration rather than through the courts." (Docket No. 19.)

**I.      The Motion to Compel Arbitration and Stay Proceedings**

On May 5, 2017, Lincoln filed the pending motion (Docket No. 19), accompanied by a Memorandum in Support (Docket No. 20) and the Declaration of Lynn Fetzer, the company's Southeast Region Payroll and Benefits Manager (the "Fetzer Declaration") (Docket No. 21). Attached to the Fetzer Declaration is a copy of Lincoln's Employee Handbook, which states in bolded text on its first page:

> This Employee Handbook . . . contain[s] a binding Arbitration Agreement between you and Lincoln.  Please review the Arbitration Policy carefully and understand that your execution of the Employee Handbook Acknowledgement and Agreement to Arbitrate or, simply, your continued employment with Lincoln will acknowledge and confirm your agreement to binding arbitration as set forth in the Arbitration Policy.

(Docket No. 21 (Ex. 1), p. 1.)  The entire arbitration policy is set forth at the end of the

---

same counsel as Lincoln – has filed an Answer to the plaintiff's complaint "with the expectation that [the plaintiff] will file a motion to amend pursuant to Federal Rule of Civil Procedure 15" to name the proper defendant. (Docket No. 8, p. 1.) The plaintiff has not filed such a motion, however, and the court does not find resolution of this issue necessary to its consideration of the pending motion.

Employee Handbook and includes a provision stating that "[n]either [Lincoln] nor [its] employees] will pursue any claim against the other as a member or representative of a class." (*Id.* at pp. 43–46).  The Employee Handbook also includes a form titled "Employee Handbook Acknowledgment and Agreement to Arbitrate," which the employee is directed to sign in acknowledgment of her receipt of the Employee Handbook and agreement to arbitrate all claims relating to her employment.  (*Id.* at pp. 3–4.)  The text further directs that the original copy of the form is "to be placed in [the] Employee's Personnel File."  (*Id.*)

According to Ms. Fetzer, "[a]t or near the time she joined Lincoln Apartment Management, Ms. Amos was provided with Lincoln's Employ[ee] Handbook," and "[s]he was reminded that she needed to sign an [Employee] Handbook Acknowledgement, but she never did."  (Docket No. 21 ¶ 4.)  The Fetzer Declaration does not, however, provide any basis for Ms. Fetzer's purported knowledge of Ms. Amos's receipt of the Employee Handbook, nor does it attach any documentation demonstrating that Ms. Amos was provided with the Employee Handbook or reminded to sign an acknowledgment form.  Ms. Fetzer further contends that Ms. Amos was familiar with the terms of the arbitration policy because one of Ms. Amos's duties as a business manager was to "onboard" new employees, which required her to "deliver the Handbook, explain the policies contained therein (including the Arbitration Policy), and collect signed acknowledgements."  (*Id.* ¶ 5.)  Moreover, Ms. Fetzer states, Ms. Amos was required to review updates to company policies and "new hire" documents – both of which include the arbitration agreement – in her capacity as a business manager.  (*Id.* ¶ 6.)  Finally, Ms. Fetzer notes that Ms. Amos attended training sessions – including a course titled "Tennessee Payroll 101" – in which Lincoln's arbitration policy was reviewed and discussed.  (*Id.*)

Based on the Fetzer Declaration, Lincoln argues that Ms. Amos "not only obtained direct

3

knowledge of the Arbitration Policy at or near the time she was hired, [but] she [also] independently knew of the policy in her capacity as Business Manager at Gale Lofts." (Docket No. 20, p. 3.) With knowledge of the arbitration policy – and that her continued employment with Lincoln would acknowledge and confirm her agreement to arbitrate – Ms. Amos remained with the company. (*Id.* at pp. 6–7.) According to Lincoln, this decision to continue her employment "constituted [Ms. Amos's] assent to the terms of the arbitration agreement," consistent with the terms of the arbitration policy and Tennessee law "recogniz[ing] the validity of unilateral contracts, in which acceptance is indicated by action under the contract." (*Id.* (quoting *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 978 (6th Cir. 2007)).) Accordingly, Lincoln requests that the court compel arbitration of Ms. Amos's claims and dismiss this case or, in the alternative, stay it pending resolution of the arbitration. (*Id.* at p. 9.)[2]

## II.     Ms. Amos's Response in Opposition

On May 19, 2017, Ms. Amos filed a Response in Opposition to the pending motion, in which she argues that Lincoln never effectively communicated that there was a written arbitration policy that applied to her or informed her that her acceptance of that agreement was a condition of her continued employment. (Docket No. 22, pp. 5–10.) Ms. Amos argues, therefore, that, under Tennessee law, Lincoln did not make a legally effective offer of the arbitration agreement to her, and she did not knowingly accept that agreement. (*Id.*) For these reasons, Ms. Amos argues that Lincoln has failed to "carry its burden of establishing" the existence of a valid agreement to arbitrate, and its motion should be denied. (*Id.* (citing *Johnson*

---

[2] Lincoln also argues that the arbitration agreement is valid and enforceable because it is supported by valid consideration and is not an unconscionable contract of adhesion. (Docket No. 20, pp. 7–9.) Ms. Amos has not challenged these positions in her Response, and the court, therefore, will not review their merits in its consideration of the pending motion.

4

*v. Long John Silver's Rests., Inc.*, 320 F. Supp. 2d 656, 664 (M.D. Tenn. 2004)).)

As support for her argument that no valid agreement to arbitrate was ever formed, Ms. Amos has submitted a declaration describing her exposure to, and understanding of, the company's arbitration policy. (Docket No. 23 (Decl. N. Amos).) Ms. Amos states that, when she was hired, she was asked to sign a number of documents but was not "given, shown, or told about any handbook or an arbitration agreement, nor did [she] sign any acknowledgement of receiving or reviewing a handbook or arbitration agreement." (*Id.* ¶¶ 3–4.) Ms. Amos further states that she believed that she had been given all relevant documents at the time of her hiring and that she was unaware, therefore, that Lincoln had any policy regarding the arbitration of claims relating to her employment. (*Id.* ¶ 4.) According to Ms. Amos, she first learned of Lincoln's arbitration policy at a training for business managers in January of 2016, approximately one year after she had been hired and six months after she was promoted to business manager. (*Id.* ¶¶ 5–6.) During this conference, Lincoln representatives distributed a set of documents relating to the "onboard[ing]" of new hires to the business managers in attendance, including Ms. Amos. (*Id.* ¶ 7.) The representatives explained that these documents – including those relating to Lincoln's arbitration policy – were "new or updated" and that it was particularly important that business managers have new hires sign the arbitration agreement, "because there had been some previous lawsuits." (*Id.* ¶¶ 7–9.) According to Ms. Amos, neither she nor any other business manager was told during the conference "that any of these documents applied to [them]," and they were not asked to sign the documents. (*Id.* ¶ 10.)

Ms. Amos avers that she had never seen, reviewed, or signed any arbitration policy prior to this training conference, and her understanding of the policy both during and after the conference was that it applied only to new employees – *i.e.*, those hired after January of 2016.

(*Id.* ¶¶ 11–12.) According to Ms. Amos, "[n]o one at Lincoln . . . has ever conveyed to [her] that there is an arbitration agreement that applies to [her] and [her] employment with the company, or shown [her] what the terms of that agreement look like" (*id.* ¶ 13) and, therefore, there could not be any "meeting of the minds" on the arbitration policy or its terms (Docket No. 22, p. 10). Absent proof of such a mutual promise, Ms. Amos contends, Lincoln has failed to carry its burden of proving that she knowingly waived the right to pursue her claims in court, and the pending motion must be denied. (*Id.*)

### III. Lincoln's Reply in Support of the Pending Motion

On May 24, 2017, Lincoln filed a Reply in support of the pending motion, in which it argues that Ms. Amos knowingly accepted the arbitration agreement during her employment and, therefore, is subject to its terms. (Docket No. 25-1, p. 1.) Lincoln introduces no additional evidence demonstrating that Ms. Amos knew that the arbitration policy applied to her position, but it argues that Ms. Amos's assertion that she did not recall receiving the Employee Handbook when she was hired does not, on its own, adequately refute the existence of an agreement to arbitrate. (*Id.* at pp. 1–2 (citing *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891 (M.D. Tenn. 2003)).) At a minimum, Lincoln argues, Ms. Amos was aware that Lincoln had an arbitration policy after she completed business manager training in January of 2016, and "[h]er continued employment after that conference constitutes sufficient acceptance of the agreement to make it a valid contract." (*Id.*) Moreover, Lincoln notes that Ms. Amos had "repeated encounters" with the arbitration agreement during the course of her employment "through company training programs, receipt of updates to company policies, and revisions of company 'new hire' documents," as evidenced by the Fetzer Declaration. (*Id.* at pp. 3–4 (citing Docket No. 21 ¶¶ 4–6).) Based on this evidence, Lincoln argues that Ms. Amos must have had knowledge of the

arbitration policy and its terms, which she accepted through her continued employment and thereby made valid and enforceable. (*Id.*)

## IV. Ms. Amos's Sur-Reply and Lincoln's Response

On June 5, 2017 – with leave of the court – Ms. Amos filed a Sur-Reply in order to address the Sixth Circuit's decision in *National Labor Relations Board v. Alternative Entertainment, Inc.*, No. 16-1385, 2017 WL 2297620 (6th Cir. May 26, 2017), which was issued after briefing on the pending motion was completed. (Docket No. 33.) In *Alternative Entertainment*, the Sixth Circuit held that an arbitration agreement that bars employees who are covered by the National Labor Relations Act ("NLRA") from taking any concerted legal action – including collective arbitration – is unenforceable under the FAA because it violates the NLRA's guarantee of the right to collective action. 2017 WL 2297620, at *4–9. Ms. Amos argues that the *Alternative Entertainment* decision prohibits an employer from "impos[ing] an arbitration agreement on its employees that contains a waiver of class and collective actions." (Docket No. 33, p. 1.) Based on this holding, Ms. Amos argues that Lincoln's arbitration policy – which contains a class waiver – is "unenforceable as written." (*Id.* at p. 2.)

On June 9, 2017 – also with the court's leave – Lincoln filed a Response to Ms. Amos's Sur-Reply, in which it argues that Ms. Amos has "attempt[ed] to expand the impact of [*Alternative Entertainment*] beyond the actual holding of the court." (Docket No. 37, p. 1.) After noting that the Sixth Circuit's decision "contribute[s] to a . . . circuit split" that will likely be resolved by the Supreme Court later this year, Lincoln argues that the class waiver contained in the arbitration policy does not, on its own, render the entire policy unenforceable. (*Id.* (citing *Morris v. Ernst & Young LLP*, 834 F.3d 975 (9th Cir. 2016), *cert. granted*, 137 S. Ct. 809 (2017)).) Lincoln argues that, under Tennessee law, "courts should interpret a contract in a way

7

that supports its validity and invalidates only the offending contractual terms," which requires this court to sever the class waiver provision from the broader agreement to arbitrate. (*Id.* at p. 2 (citing *In re Baby*, 447 S.W.3d 807, 831 (Tenn. 2014)).) According to Lincoln, "[t]here is nothing in *Alternative Entertainment* that should keep this Court from compelling arbitration as agreed to by the parties." (*Id.*)

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This text reflects the overarching principle that arbitration is a matter of contract" and, "consistent with that text, courts must 'rigorously enforce' arbitration agreements according to their terms[.]" *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013). The FAA embodies a "liberal federal policy favoring arbitration agreements," *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), and there is a strong presumption in favor of arbitration under the Act, *O.J. Distrib., Inc. v. Hornell Brewing Co., Inc.*, 340 F.3d 345, 355 (6th Cir. 2003). Under the FAA, where a litigant establishes the existence of a valid agreement to arbitrate the dispute at issue, the district court must grant the litigant's motion to compel arbitration and stay or dismiss proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3–4). The party opposing arbitration has the burden to prove that there is a "genuine issue of material fact as to the validity of the agreement to arbitrate." *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 750 (E.D. Tenn. 2011) (quoting *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002)).

## ANALYSIS

In determining whether to compel arbitration of a party's claims, the court must "engage in a limited review to determine whether the dispute is arbitrable." *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). This review requires the court to determine whether "a valid agreement to arbitrate exists between the parties and [whether] the specific dispute falls within the substantive scope of the agreement." *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 561 (6th Cir. 2008). Ms. Amos has not argued that her claims fall outside of the scope of Lincoln's arbitration policy, but she has argued that she never knowingly assented to waive her right to submit claims relating to her employment to a court and that, therefore, there exists no valid arbitration agreement between her and Lincoln.

As the Sixth Circuit has noted, arbitration agreements are "fundamentally contracts," and courts must review their enforceability "according to the applicable state law of contract formation." *Seawright*, 507 F.3d at 972. Under Tennessee law, "[a] valid, enforceable contract requires consideration and mutual assent, manifested in the form of an offer and an acceptance." *Ace Design Grp., Inc. v. Greater Christ Temple Church, Inc.*, No. M2016-00089, 2016 WL 7166408, at *7 (Tenn. Ct. App. Dec. 8, 2016); *accord Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 675 n.8 (Tenn. Ct. App. 2007). Lincoln admits that Ms. Amos never signed an acknowledgment form affirming that she had reviewed the Employee Handbook and agreed to its material terms, including the arbitration policy. (Docket No. 20, p. 3 (citing Docket No. 21 ¶ 4).) As Lincoln correctly notes, however, Ms. Amos's failure to sign her assent to the arbitration policy does not necessarily signify that no valid arbitration agreement exists between the two parties. (*Id.* at pp. 5–6.) Rather, Tennessee "recognizes the validity of unilateral

9

contracts, in which acceptance is indicated by action under the contract." *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 895 (M.D. Tenn. 2003); *see also Seawright*, 507 F.3d at 978 ("[A]rbitration agreements under the FAA need to be written, but not necessarily *signed*."). Lincoln argues, therefore, that Ms. Amos agreed to arbitrate all claims relating to her employment when she continued her employment with the company after she (1) received the Employee Handbook, which states that her "continued employment with Lincoln will acknowledge and confirm [her] agreement to binding arbitration," and (2) had "repeated encounters with the arbitration agreement," which demonstrates that she had knowledge of the agreement's terms. (Docket No. 25-1, p. 3.)

Lincoln's argument, however, ignores the evidence placed into the record by Ms. Amos, which raises a genuine issue of material fact as to whether she was ever informed that her acceptance of an arbitration agreement was a condition of her continued employment with the company. Ms. Amos has submitted her sworn statement averring that she was not given, shown, or told about any Employee Handbook or arbitration policy when she was hired and was thereby unaware that Lincoln had any arbitration policy for the first year of her employment with the company. (Docket No. 23 ¶ 4.) Moreover, though Ms. Amos admits to having learned that Lincoln had an arbitration policy during the business manager training in January of 2016, she clarifies that – based on statements made by Lincoln representatives during that training – she believed that the arbitration policy applied only to new hires and not to those already employed by the company. (*Id.* ¶¶ 7–11.) According to Ms. Amos's sworn statement, she was never informed that the documents distributed at this training or the policies contained therein applied to her as a business manager, nor was she ever informed that the arbitration policy described in those documents applied to individuals who were already employed by Lincoln. (*See id.* ¶¶ 8–9

(noting that the documents were described as "new or updated" and that business managers were instructed to "ensure that new employees signed the arbitration agreement because there had been some previous lawsuits").) Ms. Amos, therefore, has presented evidence demonstrating that Lincoln never effectively communicated to her that the company's arbitration policy applied to her, specifically, or that her continued employment would constitute acceptance of an agreement to arbitrate all claims relating to her employment. She has thereby demonstrated that there exists a genuine issue of material fact as to the validity of the agreement to arbitrate asserted by Lincoln, which precludes this court from compelling arbitration of her claims at this time.

Nothing submitted by Lincoln in support of the pending motion effectively refutes the points made in Ms. Amos's sworn statement or demonstrates that the dispute of fact that she has raised is anything less than genuine. Lincoln has attempted to refute Ms. Amos's recollection of her hiring with the Fetzer Declaration's statement that, "at or near" the time Ms. Amos was hired, she "was provided with Lincoln's Employ[ee] Handbook" and "reminded that she needed to sign an . . . Acknowledgement, but she never did." (Docket No. 21 ¶ 4.) This statement, however, is completely unsupported by any evidence demonstrating the basis for Ms. Fetzer's purported knowledge of the documents given to, and requested from, Ms. Amos at the time of her hiring. Moreover, Ms. Amos challenged this portion of the Fetzer Declaration for lack of foundation in her Response (Docket No. 22, p. 7 n.2), and Lincoln did not even acknowledge, let alone remedy, the deficiency in its Reply. Ms. Fetzer's statements regarding the paperwork given to Ms. Amos at her hiring, therefore, are of little, if any, weight in the court's consideration of the pending motion and, even if the court were to credit those statements, they do little more than confirm that there is a genuine issue of material fact as to the validity of the agreement to

arbitrate.  Lincoln has also attempted to refute Ms. Amos's contention that she never understood that the arbitration policy applied to her, specifically, by introducing evidence demonstrating that Ms. Amos periodically reviewed the company's arbitration policy when it was updated or discussed in a training.  (*See* Docket No. 25-1, pp. 3–4.)  Nothing submitted by Lincoln, however, reveals any statement made during any policy update or training that would be understood by a reasonable person to signify that the company's arbitration policy applied to employees who were already employed by Lincoln as of January of 2016 and who had never signed an acknowledgment form agreeing to the terms of that policy.  Lincoln, therefore, has failed to produce any evidence demonstrating that the disputes of fact raised by Ms. Amos are anything less than genuine.

Lincoln also argues that "Ms. Amos's assertion that she does not remember receiving the Employee Handbook when she was hired" is not, as a matter of law, sufficient to refute the existence of an agreement to arbitrate. (Docket No. 25-1, p. 1–2 (citing *Fisher*, 276 F. Supp. 2d 891.)  It is true that a number of courts have found that a valid agreement to arbitrate existed even though the plaintiff had submitted a sworn statement averring that he did not recall receiving notice of his employer's arbitration policy at the time that he was hired.  *See, e.g.*, *Fisher*, 276 F. Supp. 2d at 895; *Sellers v. Macy's Retail Holdings, Inc.*, No. 2:12-cv-02496, 2014 WL 2826119, at *9 (W.D. Tenn. June 23, 2014).  In these cases, however, there existed additional, competent evidence that the plaintiff did, in fact, know that the defendant's arbitration policy was a condition of his employment, such as incontrovertible evidence that the plaintiff had received a copy of the documents containing the arbitration policy or the plaintiff's own admission that he was aware of the policy and its application to him.  *See Fisher*, 276 F. Supp. 2d at 895 (noting that the plaintiff admitted that he had discussed the arbitration policy with other

employees and was concerned about its application to him); *Sellers*, 2014 WL 2826119, at *7 (finding that there is "no genuine dispute that the parties mutually agreed to be bound" by an arbitration agreement where the plaintiff did not recall agreeing to arbitrate her claims but had signed a form acknowledging that she had received documentation of the company's arbitration policy). Lincoln has failed to submit any such evidence, and Ms. Amos disputes that she was ever aware that the company's arbitration policy applied to her.

There is no evidence in the record establishing that Ms. Amos knew that her acceptance of an arbitration agreement was a condition of her continued employment with Lincoln, and the court, therefore, cannot conclude that her decision to remain in her position as a business manager evidenced any intent to agree to arbitrate all disputes with Lincoln. Lincoln has failed to establish the existence of a valid agreement to arbitrate that would bind Ms. Amos and, accordingly, the court must deny Lincoln's request that Ms. Amos be compelled to pursue her claims in arbitration.[3]

## CONCLUSION

For the reasons discussed herein, the defendant's Motion to Compel Arbitration and Stay Proceedings (Docket No. 19) will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[3] Because the court has determined that there exist genuine disputes of material fact regarding the existence of any agreement to arbitrate between the parties, it does not reach the merits of the parties' arguments regarding the Sixth Circuit's recent decision in *Alternative Entertainment*, 2017 WL 2297620.

13